# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## FORT MYERS DIVISION

APRIL CAMPBELL-MCFOLEY,

        Plaintiff,

-vs-                                     Case No.  2:08-cv-519-FtM-29SPC

COMMISSIONER OF SOCIAL SECURITY,

        Defendant.

_____

## REPORT AND RECOMMENDATION

**TO THE UNITED STATES DISTRICT COURT**

This matter comes before the Court on the Plaintiff, April Campbell-McFoley's Complaint Seeking Review of the Final Decision of the Commissioner of Social Security (Commissioner) denying the Plaintiff's Claim for Disability Insurance (Doc. # 1) filed on June 30, 2008.  The Plaintiff filed her Memorandum of Law in Support of the Complaint (Doc. #18) on January 30, 2009.  The Commissioner filed a Memorandum of Law in Support of the Commissioner's Decision (Doc. #19) on February 26, 2009.  Thus, the Motion is now ripe for review.

The Undersigned has reviewed the record, including a transcript of the proceedings before the Administrative Law Judge (ALJ), the exhibits filed and administrative record, and the pleadings and memoranda submitted by the parties in this case.

## FACTS

### *Procedural History*

On December 1, 2004, the Plaintiff protectively filed a Title II application for a period of disability and disability insurance benefits. (Tr. 10).  The Plaintiff also protectively filed a Title XVI

application for supplemental security income on December 1, 2004. (Tr. 10). In both applications, the Plaintiff alleged an onset disability date of May 1, 2004. (Tr. 10). The claims were denied initially on February 4, 2005, and upon reconsideration on August 29, 2005. (Tr. 10). The Plaintiff filed a timely request for hearing on September 19, 2005. (Tr. 10). On October 11, 2007, a video hearing was held before the Honorable Drew A. Swank, Administrative Law Judge. (Tr. 437-480). On December 14, 2007, an unfavorable decision was issued. (Tr. 10-20). The Plaintiff timely filed a Request for Review of the hearing by the Appeals Council. (Tr. 6). The Appeals Council denied the Plaintiff's Request for Review on May 27, 2008. (Tr. 2-4). Therefore, the decision of the Commissioner became final. Having exhausted all administrative remedies, the Plaintiff timely filed a Complaint with this Court.

## *Plaintiff's History*

The Plaintiff was born on May 9, 1971, making her thirty-six (36) years old at the time of the hearing, which is defined as a younger individual. (Tr. 18). The Plaintiff has a high school education, no vocational training or military service and can communicate in English. (Tr. 18). The Plaintiff's past relevant work history was in the retail sector in the receiving department and as a sales associate. (Tr. 54-61). The Plaintiff alleges an onset disability date of May 1, 2004, due to headaches, hypertension, severe back pain, cognitive difficulties including serious memory loss, depression and anxiety. Pl. Brief, Doc. #18, p.3.

## *Medical and Psychological History*

On June 4, 2004, the Plaintiff presented to Health Park Hospital with a severe headache and recurrent seizures. (Tr. 301). While at Health Park, it was discovered the Plaintiff had a large basal ganglial hemorrhage with intraventricular extension. This condition was treated through

neurosurgery and she was placed on Dilantin to control seizures. At the time of her transfer from the hospital to the rehabilitation hospital, it was noted that she had left sided symptoms and some difficulty with speech. (Tr. 299).

The Plaintiff was discharged from the rehabilitation hospital on June 24, 2004. (Tr. 300). Discharge notes state that the Rehabilitation Team was more concerned about the Plaintiff's cognitive functioning, specifically her recent memory, than they were about other problems. It was also noted that she had not had a recurrence of seizures since admission. (Tr. 300). Although she had undergone a battery of neuropsychiatric tests, those results were not available at discharge. (Tr. 300). Her discharge diagnosis' were: "(I) Right intra-cranial hemorrhage intraventricular extension, probably secondary to hypertension, (unreadable on transcript), (2) Seizure, singe. non-recurrent, generalized event on acute presentation (3) Hypertension, (4) Status post spontaneous vaginal delivery on 5/24/2004 (5) Hemorrhoids." (Tr. 300).

On June 24. 2004, after the Plaintiff was released from the rehabilitation hospital, she presented at Health Park complaining of right sided chest pain. (Tr. 154). The pain was of such severity that she was practically bedridden. (Tr. 154). The Plaintiff underwent an abdominal ultrasound which revealed trace sludge in gallbladder, but there was no evidence of any stone. (Tr. 154,. 146) She underwent a pelvic ultrasound which revealed fluid filled endometrium. (Tr. 154, 134). Due to the Plaintiff's severe right sided chest pain on June 26, 2004, a (CTA)[1] was performed which revealed the presence of a pulmonary embolism. (Tr. 154).

---

[1]CTA is a CT scan using contract to examine the pulmonary arteries in the lungs to detect pulmonary embolism.

A lateral chest x-ray performed on June 27, 2004, revealed extensive infiltrate in the right lower lobe of the lung and pleural effusion. (Tr. 245). In order to treat her condition, she was given both Lovenox and Coumadin. After a blood test revealed elevated liver enzymes, her Coumadin was discontinued. Since her intra cranial hemorrhage, the Plaintiff had been on Dilantin to prevent seizures . (Tr. 154). However, since the Plaintiff had not experienced any seizures since her surgery, her medication was switched to Keppra and Neurontin. (Tr. 154). When Dr. Marino visited the Plaintiff on June 27, 2004, she stated that she had "chronic left hemiparesis," (slight paralysis on one side). (Tr. 145). There are no new neurological problems. (Tr. 304). On July 6, 2004, the Plaintiff was discharged from the hospital. (Tr. 154).

On July 28, 2004, the Plaintiff had her first examination since leaving the hospital with Dr. Marino, treating neurologist. In a letter to Dr Joseph Salaz, MD., the Plaintiff's primary care provider, Dr. Marino wrote that the Plaintiff was experiencing headaches. (Tr. 169). Dr. Marino stated the Plaintiff tired easily and has blurred vision. (Tr. 169). Upon physical examination, he wrote that the Plaintiff provided a coherent history and that her mood and affect were appropriate, the rest of his neurological exam "was unremarkable". (Tr. 168-169). His diagnosis was tension headaches and intracranial hemorrhage (Tr. 168). He concluded his letter by stating that she was doing well from a neurological standpoint (Tr. 167)

In August of 2004, the Plaintiff called Dr. Marino's office complaining of daily headaches which are absent when she first awakens but become more intense as the day progresses. (Tr. 173). On August 5, 2004, the Plaintiff had a brain CT without contrast. (Tr. 175). The results were normal. (Tr. 175). However, it was noted in a comparison with an earlier brain CT from June 6, 2004, that although there had been some draining and clearing around the hemorrhage, there was

"small radiopaque density overlying the right frontal lobe". (Tr. 176). Also, in August 2004, she was seen by Dr. Brian E. Longendyke, D.O. for a gastroenterology consult regarding her elevated liver enzyme count which appeared to be declining from its previously elevated range. (Tr.178-177).

On August 11, 2004, the Plaintiff was seen by Dr. Salaz for a follow-up examination. Dr Salaz found tenderness to palpation around her cervical neck and lower lumber area [L5-S1] as well as guarding behavior around the abdomen. His diagnostic assessment was status post brain hemorrhage, hypertension, and arthritis/tendonitis. With respect to her mental state, Dr. Salaz wrote that she seemed confused as to which doctor was treating what problem and that he spent 20 minutes explaining to her the cause of her medical problems. (Tr. 179).

On September 8, 2004, Dr. Marino authored a letter that is very similar to his earlier letter, once again finding a normal neurological examination, but a continuation of problems with headaches for which he prescribed Topamax. The Plaintiff returned to Dr. Salaz in August of 2004, having problems with ambulation, decreased breath sounds, a severely limited range of motion in her neck and shoulders and only about 65% of what is considered forward flexion. Dr. Salaz' assessment noted that her brain hemorrhage was stable, but that her hypertension, arthritis and gastroesophogeal reflux were "unstable". (Tr. 182).

In October 2004, the Plaintiff was seen by Dr. Longendyke, a gastroenterologist, for abdominal pain and Dr Salaz for anxiety, pain and headaches. (Tr. 199, 206). When the Plaintiff saw Dr. Salaz on October 25th, she was having difficulty standing due to pain and discomfort. Dr. Salaz noted a severe limit to her range of motion. (Tr. 206). Based on this examination and Plaintiff's history, he referred her to Dr. Velmir A Micovic, M.D. of Lee Pain Services. (Tr. 206). Dr. Micovic examined Plaintiff on November 3, 2004. During his examination, he found her to have

mild tenderness to her left flank.   In the section of his report  labeled "Review of Symptoms",  he

wrote: "A 9 point system review is documented in the chart and is positive for night sweats, poor

balance, difficulty concentrating, occasional blurred vision, sore throat, cough, abdominal pain,

nausea and constipation".  (Tr. 208).  His diagnostic impression was "Thoracolumbar myofascial

pain," and he told her to continue with Dacocet  for  pain, and that aqua therapy, physical therapy

and a TENS unit might help her with her pain. (Tr. 207).

In November 2004, the Plaintiff returned to Dr. Marino for a follow up visit.  During this

visit, Dr. Marino noted that the Plaintiff  had chronic problems with headaches and flank pain and

that she had been prescribed multiple medications for pain.  In a letter written to Dr. Salaz he stated,

"Upon questioning, it is not even really clear to me that she knows which medications she is taking

and what she is not. She presents with all of her pills and bottles in a bag." (Tr. 210). Dr. Marino

noted that he felt that she was overmedicated and that he reduced her medications, disposed of the

ones she should not be taking, and stated that he hoped the pain management people could help her.

(Tr. 209).

During her January 2005 visit with Dr. Salaz, the Plaintiff placed her back pain at 4 on a scale

of 1-10.  She displayed a full range of motion in her back, but continued to experience slight

tenderness at L4-S1.  (Tr. 325).  However, she was now experiencing blood in her urine.  Dr. Salaz

was concerned about the Plaintiffs Coumadin therapy.  (Tr. 325). Dr. Marino saw the Plaintiff on

February 11, 2005.   At that time, he wrote the following:

> She has had chronic ongoing problems with headaches and flank pain.  She has
> demonstrated some problems with cognition, following instructions and compliance
> that may have preceded her problems.  I have been trying to help her to simplify her
> medication regimen. (Tr. 315).

Continuing with his examination of February 11, 2005, Dr. Marino summarized his neurological examination of the Plaintiff as follows:

> NEUROLOGICAL EXAM: APPEARANCE: This patient is well developed, well nourished, provides a coherent history is in no acute distress. MENTAL STATUS: The patient is oriented to time, place and person. Mood and affect appropriate. CRANIAL: CNS-II-VII grossly intact. MOTOR: 5/5 strength in upper and lower proximal and distal muscles. Normal bulk and tone. No fasciculations [twitching]. DTRs: The patient has deep tendon reflexes 2+/4 and symmetrical SENSORY: The patient has normal sensation to touch, pinprick, and vibration. GAIT: normal gait TREMOR: No tremor noted. CEREBELLAR: No cerebellar signs present. CAROTID BRUT: normal carotids. HEART: Normal heart. Peripheral pulses intact (Tr. 314).

Also, in the report of this visit, he stated that there were no changes in her review of symptoms. His impression remained the same as his previous diagnoses, tension headache and intracranial hemorrhage. Due to her continuing headaches, he wanted to gradually increase her Topomax and wanted to continue to simplify her medication routine. (Tr. 314). On February 17, 2005, Dr. Marino commented on an MRI failed to reveal any intraorbital or intracranial foreign bodies. (Tr. 289, 290). However, there was a "hemosiderin" present in the area of her prior intracerebral hemorrhage. (Tr. 289-290).

On April 21, 2005, Dr. Marino noted that the Plaintiff continued to have blurred vision, back pain, headaches and cognition problems. (Tr. 317). He increased her Topomax dosage and indicated that he was puzzled by her continuing headaches and flank pain. (Tr. 317).

The Plaintiff was without insurance for a period of time. When the Plaintiff regained insurance, Dr. Marino restarted the Plaintiff on Topamax prophylactically on February 2, 2006. (Tr 418-416). Despite a normal neurologica1 evaluation, the Plaintiff stated she was still experiencing blurred vision, back pain and headaches (Tr. 418-417).

On March 24, 2006, the Plaintiff returned to Dr Salaz for a variety of problems. (Tr. 410). Dr. Salaz' physical musculoskeletal examination found a severe limitation of range of motion in her neck and shoulders, and his notes further indicate that he prescribed Amitriptyline for anxiety. (Tr. 410). The Plaintiff presented to Dr Salaz in May 2005 for back pain, anxiety, depression, insomnia and restlessness. Examination showed decreased breath sounds bilaterally, tenderness over her back, difficulty with forward flexion and with heel to toe walk. (Tr. 411).

On July 7, 2006, the Plaintiff presented to the emergency room and was examined by Dr. Macchiaroli, for a severe frontal headache and one episode of vomiting. With the exception of the problems listed above, the examination was normal . (Tr. 405-404).

In 2007, a dictated note by Dr. Salaz lists that Plaintiff is having problems with bronchitis, insomnia, anxiety and arthritis. (Tr. 419).

### *Dr. Joseph J. White*

Dr. Joseph J. White, Ph.D., saw the Plaintiff on June 1,2005, and based his evaluation on three separate parts: (l) a clinical interview with the Plaintiff, (2) an interview with the Plaintiff's mother and (3) a 2005 neurological evaluation from Dr. Marino. During his in person clinical interview, Dr. White noted that Plaintiff's speech was slow and pressed, but that her thought pattern was clear and coherent. Dr. White further noted a flat affect and wrote that the Plaintiff told him that she had been "having conversations in my head" but denied any suicidal ideations. He found her judgment and insight to be only "fair" and her IQ was estimated to be in the low average range. Although oriented to time and place, she displayed "poor attention, concentration and inadequate short-term memory." (Tr. 359). The Plaintiff was unable to complete either serial 7's or to interpret proverbs. (Tr. 359). Dr. White listed some of her medical problems to be low back pain, weakness

on the left side, severe headaches post brain hemorrhage, periodic disorientation, memory problems and a history of both depression and anxiety. (Tr. 359). His DSM-IV Diagnoses were: Axis I: Depressive Disorder NOS, Anxiety Disorder NOS, Amnestic Disorder due to Brain Hemorrhage. (Tr. 359). Dr. White found the Plaintiff capable of driving, but unable to cook or manage her own funds. His conclusion read as follows: April Campbell is a 34 year old, black female who presents with a number of physical deficits and related depression, anxiety and memory problems, which are considered to be a barrier to her overall functioning. (Tr. 358).

### *Dr. J. L. Bernard, Ph.D*

Dr. Bernard's findings were consistent with those of Dr. White. Specifically, Dr Bernard found that Plaintiff had memory problems as displayed in her day- to-day functioning when he called to confirm her appointment only to discover that she had forgotten it. (Tr. 365). Upon examination, Dr. Bernard noted that the Plaintiff's orientation for place was good, but she was not oriented as to time. Her judgment and insight were deemed to be only "fair at best," and her thought processes were found to be "clear and logical within her cognitive limitations post-aneurysm." With respect to memory, Dr. Bernard found not only could the Plaintiff not remember 3 words he had asked her to remember 90 seconds earlier, she did not remember being told the words at all. (Tr. 364-363).

Objective testing confirmed that the Plaintiff was quite impaired according to her scores on the Wechsler Adult Intelligence Scale III (WAIS) and the Wechsler Memory Scale I1l (WMS). Her scores on the WAIS placed her in the mildly mentally retarded category (Verbal IQ 67, Performance IQ 65 and Full Scale IQ 64). (Tr. 364). Her VMS scores indicated serious memory problems with 98% or more of a comparable population expected to score better than she did. (T r. 364). It should be noted that Dr. Bernard found that the Plaintiff had taken pain medicine between the WAIS and

the VMS and that while this might have had an adverse effect on her WMS score, he specifically stated: "[However] I do not believe that this would significantly alter my diagnosis." (Tr. 365). His diagnoses were: Amnestic disorder due to cerebral aneurysm, Major Depressive disorder, recurrent. (Tr. 364). Finally, Dr. Bernard found that Plaintiff might be able to handle funds. (Tr. 364).

<u>Non-Examining Medical Reviewers</u>:

Dr. Dinwoodie found that Plaintiff had organic mental disorder and that an RFC was necessary, specifically she found a cognitive disorder not otherwise specified. (Tr. 382, 383). She noted that Plaintiff had "moderate" restrictions in the activities of daily living and in maintaining social functioning, no episodes of decompensation and simply left the section on difficulties in maintaining concentration, persistence or pace blank. (Tr. 373). She did not find any "c" criteria. (Tr. 372). Dr. Dinwoodie felt that Plaintiff's level of functioning and IQ scores were inconsistent and wondered about the validity of the IQ scores, especially since Dr. Bernard's notes indicated that she was medicated at the time of the test. (Tr. 371). On February 1, 2005. Dr. Martha Putney, Ph D. completed a Psychiatric Review Technique Form in which she found no mental impairments. (Tr. 218-231).

Another review contained in the file was written by Dr. John Tedesco, D.O. (Tr. 232). Dr. Tedesco noted the Plaintiff had a pulmonary embolism followed by an intracranial hemorrhage and headache and myofascial pain syndrome, but stated the Plaintiff's condition was not expected to last more than 12 months. His report was dated January 31, 2005, and consisted of only one paragraph and one sentence contained on a single page. (Tr. 232). Dr Kline, M. D., reviewed Plaintiff's records on August 29, 2005. (Tr. 348-342). Dr. Kline concluded the Plaintiff could perform light

work with occasional restrictions in climbing, balancing, stooping, kneeling, crouching, and crawling. (Tr. 346-347).

*Administrative Law Judge's Decision*

Upon consideration of the medical evidence of record, the ALJ found the Plaintiff meets the insured status requirements of the Social Security Act through December 31, 2009. (Tr. 11a). The Plaintiff was found to have not engaged in substantial gainful activity since May 1, 2004, the alleged onset date (20CFR 404.1520(b), 404.1571 *et seq*., 416.920(b), and 416.971 *et seq*.). (Tr. 11a). The ALJ determined the Plaintiff suffers from the following severe impairments: headaches, hypertension, status post brain hemorrhage with organic mental disorder, back disorder, affective disorder, and anxiety (20 CFR 404.1520(c) and 416.920(c)). (Tr. 11a). However, the ALJ states the Plaintiff does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1526, 416.920(d), 416.925 and 416.926). (Tr. 13). After careful consideration of the entire record, the ALJ found the Plaintiff has the residual functional capacity to perform light work except she is limited to simple, unskilled work with limited interaction with the general public. (Tr. 14). Additionally, the Plaintiff is limited to occasional balancing, stooping, kneeling, crouching, crawling, and climbing ramps or stairs. (Tr. 14). The Plaintiff is also precluded from climbing ropes, ladders, or scaffolds. (Tr. 14). The ALJ concluded the Plaintiff is unable to perform any past relevant work (20 CFR 404.1565 and 416.965). (Tr. 18). The Plaintiff was born on May 9, 1971, which is defined as a younger individual, age 18-44, has at least a high school education and is able to communicate in English. (20 CFR 404. 1563, 404.1564 and 416.963, 416.964). (Tr. 18). The ALJ found that transferability of job skills is not material to the determination of disability because using the

Medical-Vocational Rules as a framework supports a finding that the Plaintiff is "not disabled" whether or not the Plaintiff has transferable job skills. (*See* SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2). (Tr. 18). The ALJ considered the Plaintiff's age, education, work experience, and residual functional capacity, and found there are jobs that exist in significant numbers in the national economy that the Plaintiff can perform. (20 CFR 404.1560(c), 404.1566, 416.960(c), and 416.966). (Tr. 19). Therefore, the Plaintiff was found to have not been under a disability, as defined in the Social Security Act from May 1, 2004, through the date of the ALJ's decision.

## THE STANDARD OF REVIEW

### A. Affirmance

The scope of this Court's review is limited to determining whether the ALJ applied the correct legal standards, and whether the findings are supported by substantial evidence. Hibbard v. Commissioner, WL 4365647 *2 (M.D. Fla. December 12, 2007) (citingRichardson v. Perales, 402 U.S. 389, 390, 91 S. Ct. 1420, 28 L. Ed 2d 842 (1971); McRoberts v. Bowen, 841 F. 2d 1077, 1080 (11th Cir. 1988)). In evaluating whether a claimant is disabled, the ALJ must follow the sequential inquiry described in the regulations[2]. 20 C.F.R. §§ 404.1520(a), 404.920(a). The Commissioner's

---

[2]The inquiry requires the ALJ to engage in a five-step analysis, which will either preclude or mandate a finding of disability. The steps are as follows:
*Step 1.* Is the claimant engaged in substantial gainful activity? If the claimant is engaged in such activity, then he or she is not disabled. If not, then the ALJ must move on to the next question.
*Step 2.* Does the claimant suffer from a severe impairment? If not, then the claimant is not disabled. If there is a severe impairment, the ALJ moves on to step three.
*Step 3.* Does the claimant's impairment meet or equal one of the listed impairments set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1. If so, then the claimant is disabled. If not, the next question must be resolved.
*Step 4.* Can the claimant perform his or her former work? If the claimant can perform his or her past relevant work, he or she is not disabled. If not,
(continued...)

findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). "Substantial evidence is more than a scintilla-*i.e.*, the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion." Hibbard, WL 4365647 *2 (citing Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995) (citing Walden v. Schweiker, 672 F.2d 835, 838 (11th Cir. 1982)); Richardson, 402 U.S. at 401.

Where the Commissioner's decision is supported by substantial evidence, the District Court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision. Phillips v. Barnhart, 357 F. 3d 1232, 1240 n. 8 (11th Cir. 2004). The District Court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision. Foote, 67 F.3d at 1560; Lowery v. Sullivan, 979 F.2d 835, 837 (11th Cir. 1992) (holding the court must scrutinize the entire record to determine reasonableness of factual findings).

The court "may not decide the facts anew, reweigh the evidence or substitute it's judgment for that of the [Commissioner]."Phillips, 357 F. 3d at 1240 n. 8; Dyer v. Barnhart, 357 F. 3d 1206, 1210 (11th Cir. 2005). If the Commissioner's decision is supported by substantial evidence, it should not be disturbed. Lewis v. Callahan, 125 F. 3d 1436, 1440 (11th Cir. 1997).

**B.  Reversal and Remand**

---

[2](...continued)
the ALJ must answer the last question.
     *Step 5*.  Can he or she engage in other work of the sort found in the national economy?  If so, then the claimant is not disabled.  If the claimant cannot engage in other work, then he or she is disabled.  See 20 C.F.R. §§404.1520(a)-(f), 416.920(a)-(f); see also Phillips v. Barnhart, 357 F.3d 1232, 1237-40 (11th Cir. 2004); Foote v. Chater, 67 F.3d 1553, 1557 (11th Cir. 1995) (per curiam).

-13-

Congress has empowered the district court to reverse the decision of the Commissioner without remanding the cause. 42 U.S.C. § 405 (g)(Sentence Four). The district court will reverse a Commissioner's decision on plenary review if the decision applies incorrect law, or if the decision fails to provide the district court with sufficient reasoning to determine that the Commissioner properly applied the law. Williams v. Commissioner, 407 F. Supp. 2d 1297, 1299-1300 (M.D. Fla. 2005) (citing Keeton v. Department of Health and Human Services, 21 F.3d 1064, 1066 (11th Cir. 1994)); Cornelius v. Sullivan, 936 F.2d 1143, 1145 (11th Cir. 1991). This Court may reverse the decision of the Commissioner, and order an award of disability benefits, where the Commissioner has already considered the essential evidence and it is clear that the cumulative effect of the evidence establishes disability without any doubt. Thomas v. Barnhart, WL 3366150 *3 (11th Cir. December 7, 2004) (citing Davis v. Shalala, 985 F.2d 528, 534 (11th Cir. 1993)). The district court may also remand a case to the Commissioner for a rehearing under sentence four of 42 U.S.C. § 405 (g); under sentence six of 42 U.S.C. § 405 (g); or under both sentences. Johnson v. Barnhart, 268 F. Supp. 2d 1317, 1321 (M.D. Fla. 2002) (citing Jackson v. Chater, 99 F.3d 1086, 1089 - 92, 1095, 1098 (11th Cir. 1996)).

"To remand under sentence four, the district court must either find that the Commissioner's decision is not supported by substantial evidence, or that the Commissioner incorrectly applied the law relevant to the disability claim." Johnson, 268 F. Supp. 2d at 1321; Jackson, 99 F.3d at 1090 - 91 (remand appropriate where ALJ failed to develop a full and fair record of claimant's residual functional capacity); Davis, 985 F.2d at 534 (remand to the Secretary is warranted where the ALJ has failed to apply the correct legal standards). "Where the district court cannot discern the basis for the Commissioner's decision, a sentence-four remand may be appropriate to allow the Commissioner

to explain the basis for his decision." Johnson, 268 F. Supp. 2d at 1321 (citing Falcon v. Heckler, 732 F.2d 827, 830 (11th Cir. 1984) (remand was appropriate to allow ALJ to explain the his basis of his decision)).

On remand under sentence four, the ALJ should review the case on a complete record, including any new material evidence. Johnson, 268 F. Supp. 2d at 1321; *See* Diorio v. Heckler, 721 F.2d 726, 729 (11th Cir. 1983)(finding the Court may at any time order additional evidence to be taken before the Secretary upon a showing that there is new evidence which is material and that there was good cause for the failure to incorporate such evidence into the record during a prior proceeding); *See* Reeves v. Heckler, 734 F.2d 519, 522 n.1 (11th Cir. 1984) (remanding on the grounds that it is reversible error for the ALJ not to order a consultative examination when warranted). After a sentence-four remand, the district court enters a final and appealable judgment immediately, and then loses jurisdiction. Jackson, 99 F.3d at1095; Johnson, 268 F. Supp. 2d at 1321.

In contrast, a sentence-six remand may be warranted even in the absence of an error by the Commissioner if new, material evidence becomes available to the claimant. Jackson, 99 F.3d at 1095. Sentence six of § 405 (g) provides:

> The court . . . may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding.

42 U.S.C. § 405 (g) (sentence six). "To remand under sentence six, the claimant must establish: 1.) that there is new, non-cumulative evidence; 2.) that the evidence is material — relevant and probative so that there is a reasonable possibility that it would change the administrative result; and

3.) there is good cause for failure to submit the evidence at the administrative level." <u>Green v Commissioner</u>, 2007 WL 4287528 * 3 (M.D. Fla. Dec. 4, 2007) (citing <u>Jackson</u>, 99 F.3d at 1090 - 1092; *See also* <u>Keeton v. Dept. of Health and Human Serv.</u>, 21 F.3d 1064, 1068 (11th Cir. 1994)). With a sentence-six remand, the parties must return to the district court after remand to file modified findings of fact. <u>Jackson</u>, 99 F.3d at 1095. The district court retains jurisdiction pending remand, and does not enter a final judgment until after the completion of remand proceedings.[3] <u>Id</u>.

## THE LAW

The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 416 (I), 423 (d)(1); 20 C.F.R. § 404.1505. The impairment must be severe, making the claimant unable to do his or her previous work, or any other substantial gainful activity which exists in the national economy. 42 U.S.C. § 423 (d)(2); 20 C.F.R. §§404.1505 - 404.1511.

## DISCUSSION

The Plaintiff argues the case should be remanded to the Commissioner for further review because the ALJ erred as follows: (1) failed to properly weigh the medical evidence in the record; (2) failed to analyze the Plaintiff's pain under the requirement set forth by the Eleventh Circuit including a review of the entire record; (3) found the Plaintiff could work a full range of light work and used the Grids located at 20 C.F.R. Pt. 404 Subpt. P. App 2. The Government responded that

---

[3]The time for filing an application for attorneys fees under the Equal Access to Justice Act, 28 U.S.C. § 2412 ["EAJA"] differs in remands under sentence four and sentence six. <u>Jackson</u>, 99 F.3d at 1089, 1095 n.4 and surrounding text. In a sentence-four remand, the EAJA application must be filed after the entry of judgment before the district court loses jurisdiction. <u>Id</u>. In a sentence-six remand, the time runs from the post-remand entry-of-judgment date in the district court. <u>Id</u>.

the ALJ's decision was supported by substantial evidence and made in accordance with the proper legal standards.

### (1) Whether the ALJ Failed to Properly Weigh the Medical Evidence in the Record

The Plaintiff argues the ALJ failed to give proper weight to the examining consultants Drs. White and Bernard, as well as Dr. Salaz and Dr. Marino. The Government responds that the ALJ properly discounted the above listed physicians and correctly applied the law.

While substantial weight must be given to the opinion, diagnosis and medical evidence of a treating physician, unless there is good cause to do otherwise, ( Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir.1997); Edwards v. Sullivan, 937 F.2d 580, 583 (11th Cir.1991); 20 C.F.R. § 404.1527(d)), the ALJ may discount a physician's opinion or report regarding an inability to work if it is unsupported by objective medical evidence or is wholly conclusory. Natale v. Commissioner, 2008 WL 227957 *6 (M.D. Fla. January 25, 2008). When a physician's opinion does not warrant controlling weight, the ALJ must nevertheless weigh the medical opinion based on the 1) length of the treatment relationship and the frequency of examination; 2) the nature and extent of the treatment relationship; 3) the medical evidence supporting the opinion; 4) consistency with the record as a whole; 5) specialization in the medical issues at issue; 6) other factors which tend to support or contradict the opinion. 20 C.F.R. § 404.1527(d). There is no support for a contention that the opinion of a non-treating medical expert should be evaluated any differently than opinions of other physicians. Id. Furthermore, the weight afforded a physician's opinion depends upon the extent by which it is supported by clinical or laboratory findings and is consistent with other evidence in the record. Wheeler v Heckler, 784 F.2d 1073, 1075 (11th Cir. 1986).

The ALJ may discount a treating physician's opinion or report regarding an inability to work if it is unsupported by objective medical evidence, supports a contrary finding, or is wholly conclusory. Edwards v. Sullivan, 937 F.2d 580, (11th Cir. 1991) (ALJ properly discounted treating Physician's report where the physician was unsure of the accuracy of his findings and statements); Morrison v. Barnhart, 278 F. Supp. 1331, 1334 (M.D. Fla. 2003). Where a treating physician has merely made conclusory statements, the ALJ may afford them such weight as is supported by clinical or laboratory findings and other consistent evidence of a claimant's impairments. Schnor v. Bowen, 816 F.2d 578, 582 (11th Cir. 1987); Wheeler v. Heckler, 784 F.2d 1073, 1075 (11th Cir. 1986).

Dr. Salaz has treated the Plaintiff for hypertension, arthritis, reflux disease, allergies, and her symptoms of headaches and low back pain. On December 10, 2004, Dr. Salaz wrote a prescription indicating the Plaintiff could not work or take care of her children due to her medical condition. (Tr. 12).

The ALJ ascribed very little weight to Dr. Salaz's opinion and supported that decision with substantial evidence. Initially, the ALJ noted that the Plaintiff's reflux disease was not a severe impairment within the meaning of the Social Security Act because there was no medical evidence that the disease had more than a minimal effect on the claimant's ability to work. (Tr.13). The ALJ stated "the undersigned assigns very little weight to the notes by Dr. Salaz indicating that the claimant was unable to work or care for her children . . ." (Tr. 18). The ALJ stated the notes by Dr. Salaz did "not provided any specific restrictions or objective medical evidence to support his conclusions" (Tr. 18). The ALJ also noted that Dr. Salaz' notes were inconsistent with the reports issued by Dr. Marino, the Plaintiff's neurologists. (Tr. 18). As noted by the ALJ, there were conflicting reports from treating physician's that refuted Dr. Salaz' opinion. (Tr. 18). Thus, the ALJ

supported his decision by articulating that Dr. Salaz' opinion was not bolstered by the record evidence, and that there was record evidence to support a contrary finding. *See* Phillips v. Barnhart, 357 F.3d 1232, 1240-1241 (11th Cir. 2004) (holding good cause exists for an ALJ to decline to give a treating source's opinion considerable weight when: (1) the treating source's opinion is not bolstered by the record evidence; (2) there is record evidence to support a contrary finding; or (3) the treating source's opinion is conclusory or inconsistent with source's own medical record.). Phillips v. Barnhart, 357 F.3d 1232, 1240-1241 (11th Cir. 2004).

Furthermore, Dr. Salaz' opinion that the Plaintiff was unable to work is not dispositive of the issue. Under Social Security law, the Commissioner will not give any special significance to a medical source's opinion on an issue reserved to the Commissioner such as an opinion that a claimant is "unable to work." 20 C.F.R. § 404.1527(e); 20 C.F.R. 927(e)(3). Thus, the determination of whether or not a claimant is unable to work is reserved for the Commissioner.

Regarding Dr. White and Dr. Bernard, the ALJ stated that he assigned little weight to both physicians. Dr. White, a consulting psychologist diagnosed the Plaintiff with depression, anxiety, amnesia, and residuals from the June 2004 brain hemorrhage. (Tr. 358-360). Dr. Bernard, a psychologists, also performed consultative examination on the Plaintiff and diagnosed the Plaintiff with amnesia and depression. (Tr. 364).

The ALJ stated the opinions of Drs. White and Bernard were based upon information provided by the Plaintiff that was inconsistent with the medical record. (Tr. 17). The ALJ noted that the opinion's of the state agency medical and psychological consultants were consistent with the medical evidence, and further that the opinion of Dr. Marino, the claimant's neurologist, consistently indicated that the "claimant provided a coherent medical history; was alert and oriented times three;

and had proper affect and mood." (Tr. 17). The ALJ also pointed out that the report by Dr. Bernard showed inconsistencies between scores by the claimant on the WAIS and WMS. (Tr. 17). Thus, the ALJ clearly articulated why he did not credit much weight to the opinions of Drs. White and Bernard.

Finally, the Plaintiff states the ALJ did not give proper weight to the Plaintiff's treating neurologist, Dr. Marino. The Plaintiff argues that the ALJ's reliance on Dr. Marino's neurologic findings is misplaced. However, Dr. Marino was the Plaintiff's treating neurologists. The ALJ relied heavily on Dr. Marino when discounting the opinions of the examining consultants.

The ALJ did not err in relying on Dr. Marino's findings. Substantial weight must be given to the opinion, diagnosis and medical evidence of a treating physician unless there is good cause to do otherwise. 20 C.F.R. § 404.1527 (d); Lewis, 125 F.3d at 1439 - 1441; Sabo v. Commissioner of Social Security, 955 F.Supp. 1456, 1462 (M.D. Fla. 1996). If a treating physician's opinion on the nature and severity of a claimant's impairments is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the record, the ALJ must give it controlling weight. 20 C.F.R. § 404.1527 (d)(2). Nothing in the record suggests that Dr. Marino's findings were misplaced.

After a review of the record, the Parties memoranda of law, and the ALJ's decision, it is respectfully recommended that the ALJ properly reviewed and assessed the medical evidence and applied the appropriate weight to each physician as prescribed under Social Security law.

### (2) Whether the ALJ Failed to Analyze the Plaintiff's Pain and Credibility

The Plaintiff states the ALJ failed to analyze his pain in accordance with the Eleventh Circuit's pain standard. The Government states that the ALJ properly considered the Plaintiff's pain allegations and other limitations.

Pain is a non-exertional impairment. Id. at 1559. Congress has determined that a claimant will not be considered disabled unless he furnishes medical and other evidence (e.g. medical signs and laboratory findings) showing the existence of a medical impairment which could reasonably be expected to produce the pain or symptoms alleged. 42 U.S.C. § 423 (d)(5)(A). The ALJ must consider all of a claimant's statements about his symptoms, including pain, and determine the extent to which the symptoms can reasonably be accepted as consistent with the objective medical evidence. 20 C.F.R. § 404.1528. In determining whether the medical signs and laboratory findings show medical impairments which reasonably could be expected to produce the pain alleged, the ALJ must apply the Eleventh Circuit's three-part "pain standard." Foote, 67 F.3d at 1560.

The pain standard requires (1) evidence of an underlying medical condition and either (2) objective medical evidence that confirms the severity of the alleged pain arising from that condition or (3) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain. Holt v. Sullivan, 921 F.2d 1221, 1223 (11th Cir. 1991). Pain alone can be disabling, even when its existence is unsupported by objective evidence, Marbury v. Sullivan, 957 F.2d 837, 839 (11th Cir. 1992), although an individual's statement as to pain is not, by itself, conclusive of disability. 42 U.S.C. § 423 (d)(5)(A).

In his decision, the ALJ noted "[a]fter considering the evidence of record, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms, but that the claimant's statements concerning the intensity,

persistence and limiting effects of these symptoms are not entirely credible. (Tr 16). The ALJ noted the Plaintiff's own statements as follows:

> The Plaintiff was able to prepare meals and care for her baby. She did laundry. She said that she only had problems driving for long periods of time. In a function report dated April 20, 2005, the claimant indicated that she was able to prepare her own meals (Exhibit F, page 258). She said that she tried to do all household chores but it took her longer. The claimant indicated that she was able to pay her bills and handle bank accounts. She spent time with others daily, and said that she had no problems getting along with family, friends, neighbors or others. The claimant's cousin testified that the claimant needed someone else [to] complete forms for her, but the claimant completed this function report without any apparent problems. In October 2004, the claimant reported to Dr. Salaz being unable to stand up due to pain and discomfort but Dr. Marino found that the claimant's neurological exam was normal.

(Tr. 17). While the performance of everyday tasks cannot be used to make a determination that the Plaintiff was not disabled, daily activities can be used as a measure of the Plaintiff's credibility in regard to his ability to perform certain tasks. *See* Moore v. Barnhart, 405 F.3d 1208, 1212 (11th Cir. 2005) (noting that the ALJ properly discredited a treating physicians testimony by pointing out the contrasts in the claimants daily activities and the physicians diagnosis); Wilson v. Barnhart, 284 F.3d 1219, 1226 (11th Cir. 2002) (upholding the ALJ's finding that the claimant's allegations of disabling pain were not credible because of her daily activities demonstrated otherwise). *See* Norris v. Heckler, 760 1154, 1158 (11th Cir. 1985) (holding that an ALJ may consider the plaintiff's demeanor when making a credibility determination).

The ALJ properly found that her condition could cause severe pain but that her daily activities and opinion of her treating neurologist made her claim of pain simply not credible. Thus,

it is respectfully recommended the ALJ properly assessed the Plaintiff's pain complaints pursuant to the Eleventh Circuit's pain standard.

The Plaintiff also states the ALJ failed to properly address her credibility regarding her memory problems. Contrary to the Plaintiff's assertion, the ALJ relied upon the medical evidence in the record to discount the Plaintiff's alleged memory problems. The ALJ determined that the record as a whole did not support the Plaintiff's alleged memory problems. (Tr. 14). The ALJ supported his decision with substantial evidence from the record. The ALJ noted that the Plaintiff had no problems completing her functional report and she displayed no cognitive problems testifying. (Tr. 14). Dr. Marino consistently indicated that the Plaintiff provided coherent history, and was oriented to time, place, and person. (Tr.14). The ALJ also noted that Dr. Macchiaroli opined the Plaintiff was stable throughout her visit; she had normal computed tomography of her head; and diagnostic tests were normal. (Tr. 17). An MRI of the Plaintiff's head showed no abnormalities. (Tr. 17). Dr. Marino found the Plaintiff's neurological exam to be normal. (Tr. 17).

The Plaintiff argues the ALJ did not consider the testimony of her cousin Felicia Williams when addressing her memory problems. However, the ALJ did consider Williams' testimony, but found her testimony not credible. (Tr. 17). Williams said the Plaintiff could not drive, but the Plaintiff continues to drive. (Tr. 17). Williams says the Plaintiff needs help filling out the forms, but Plaintiff had no difficulty completing her function report. (Tr. 17). Williams also said the Plaintiff's personality had changed, however, the Plaintiff's treating neurolgists did not note any such changes.

Thus, the ALJ addressed the Plaintiff's alleged memory problems and determined that they were not credible based upon the medical record and from personal observations and her ability to complete the required forms and participate in the hearing process.

*(3) Whether the ALJ Erred when he Used the Grids to Determine the Plaintiff Could Work a Full Range of Light Work*

The Plaintiff states the ALJ erred in using the Grids because the Plaintiff had non-exertional limitations including that the Plaintiff is limited to simple unskilled work with limited interaction with the general public.  Additionally, the ALJ continued that the Plaintiff was limited to occasional balancing, stooping, kneeling, crouching, crawling, and climbing ramps or stairs. (Tr. 14).  The Plaintiff states the ALJ relied on Social Security Rulings (SSR) that state the above listed limitations are minor and do not impair the Plaintiff's ability to perform a full range of light exertional work.

Once the ALJ finds that a claimant cannot return to her prior work, the burden of proof shifts to the Commissioner to establish that the claimant could perform other work that exists in the national economy. Augusto v. Commissioner of Social Security, 2008 WL 186541 *7(M.D. Fla. January 18, 2008) (citing Foote, 67 F.3d at 1558).  In determining whether the Commissioner has met this burden, the ALJ must develop a full record regarding the vocational opportunities available to a claimant. Allen v. Sullivan, 880 F.2d 1200, 1201 (11th Cir.1989). This burden may sometimes be met through exclusive reliance on the "grids." Augusto, 2008 WL 186541 at *7.  Exclusive reliance on the "grids" is appropriate where the claimant suffers primarily from an exertional impairment, without significant non-exertional factors. 20 C.F.R. Part 404, Subpart P, Appendix 2, § 200.00(e); Augusto, 2008 WL 186541 at *7 (citing Heckler v. Campbell, 461 U.S. 458, 103 S. Ct. 1952, 76 L. Ed.2d 66 (1983) (holding exclusive reliance on the grids is appropriate in cases involving only exertional impairments, impairments which place limits on an individual's ability to meet job strength requirements).

Exclusive reliance is not appropriate "either when a claimant is unable to perform a full range of work at a given residual functional level or when a claimant has a non-exertional impairment that significantly limits basic work skills." Augusto, 2008 WL 186541 at *7 (citing Walter v. Bowen, 826 F.2d 996, 1002-3 (11th Cir.1987)). In almost all of such cases, the Commissioner's burden can be met only through the use of a VE. Augusto, 2008 WL 186541 at *7 (citing Foote, 67 F.3d at 1559). It is only when the claimant can clearly do unlimited types of work at a given residual functional level that it is unnecessary to call a VE to establish whether the claimant can perform work which exists in the national economy. Augusto, 2008 WL 186541 at *7. In any event, the ALJ must make a specific finding as to whether the non-exertional limitations are severe enough to preclude a wide range of employment at the given work capacity level indicated by the exertional limitations. Id. (citing Foote, 67 F.3d at 1559).

To preclude use of the grids, a limitation must significantly or severely restrict the ability to work. A minor or merely possible restriction is insufficient. Augusto, 2008 WL 186541 at *7 (citing Kimbrough v. Sec'y of Health & Human Servs., 801 F.2d 794, 796 (6th Cir.1986)).

The Plaintiff's argument that the ALJ cannot rely on the SSR rulings lacks merit. The ALJ need only determine whether claimant's nonexertional impairments are severe enough to preclude a wide range of employment at the given work capacity level. Bouey v Commissioner, 2007 WL 4482577 *6 (M.D. Fla. December 18, 2007) (citing Phillips, 357 F.3d 1232, 1243 (11th Cir. 2004)). While SSR rulings lack the force of law, they provide guidance to the ALJ in his or her decision making process. For example, SSR-15 provides guidance on the types of restrictions in the ALJ's RFC and their impact on the use of the Grids without a Vocational Expert (VE). Bouey, 2007 WL 4482577 at * 6.

The Ruling does not mandate the use of a VE with limitations in climbing and balancing: "Where the effects of a person's actual limitations of climbing and balancing on the occupational base are difficult to determine, the services of a VS [vocational specialist] may be necessary." Id. (citing Foote, 67 F.3d at 1559). The Ruling continued that limitations in crawling does not have much of an impact: "[C]rawling on hands and knees and feet is a relatively rare activity even in arduous work, and limitations on the ability to crawl would be of little significance in the broad world or work." Bouey, 2007 WL 4482577 at * 6. The Ruling also does not mandate a VE with limitations in reaching: "Significant limitations of reaching or handling, therefore, may eliminate a large number of occupations a person could otherwise do. Varying degrees of limitations would have different effects, and the assistance of a VS [Vocational Specialist] may be needed to determine the effects of the limitations." Id. at * 7.

In this instance, the ALJ found that under SSR-14 and 15, the Plaintiff's lack of ability to crouch, or kneel did not effect her ability to work a full range of light work   The ALJ stated in his decision:

> [t]he additional limitations have little or no effect on the occupational base of unskilled light work.  To perform substantially all of the exertional requirements of most light jobs, a person would not need to crouch (SSR 83-14).  Pursuant to SSR 83-14 and SSR 85-15 light work only requires stooping occasionally.  Some limitation in climbing, balancing and kneeling do not have a significant impact on the broad world of work (SSR 85-15).  Crawling on hands and knees and feet is a relatively rare activity even in arduous work (SSR 85-15).  The ability to ascend or descend ladders or scaffolding is not significant (SSR 83-14).  A finding of "not disabled" is therefore appropriate under the framework of the above cited rule and Social Security rulings.

(Tr. 19). The SSR's are clear that the physical limitations found by the ALJ are only minor and do not limit a claimant's ability to perform a full range of a particular exertional work level.

Based upon the ALJ's decision, it is respectfully recommended the ALJ did not err when he used the Grids to determine the Plaintiff was not disabled.

Accordingly, it is now

**RESPECTFULLY RECOMMENDED:**

The final decision of the Commissioner should be **AFFIRMED**.

Failure to file written objections to the proposed findings and recommendations contained in this report within ten (10) days from the date of its filing shall bar an aggrieved party from attacking the factual findings on appeal.

**Respectfully recommended** at Fort Myers, Florida, this   27th   day of May, 2009.

SHERI POLSTER CHAPPELL
UNITED STATES MAGISTRATE JUDGE


Copies: All Parties of Record